IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF:                   :
                                    : Docket No. Misc 13-350
CHEMICAL METALS INDUSTRIES, INC.    :
BALTIMORE, MARYLAND                 :

## MEMORANDUM IN SUPPORT OF THE UNITED STATES' APPLICATION FOR ADMINISTRATIVE WARRANT

In support of its Application for Administrative Warrant, the United States states as follows:

1. The United States Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601-9675, in response to widespread concern over the severe environmental and public health effects arising from the improper disposal of hazardous wastes and other hazardous substances. See generally Eagle Picher Industries v. EPA, 759 F. 2d 922, 925-26 (D.C. Cir. 1985). CERCLA provides the United States Environmental Protection Agency ("EPA"), through delegations of authority,[1] broad powers to investigate and clean up hazardous waste sites.

2. Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1), provides in relevant part as follows:

> Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment . . . [EPA] is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance . . . at any time (including its removal from any contaminated natural resource), or

---

[1] The President of the United States has delegated most of the authority for administering CERCLA to the Administrator of EPA. See Exec. Order No. 12,418, 48 Fed. Reg. 20,891 (May 5, 1983); Exec. Order No. 12,580, 52 Fed. Reg. 2,923 (January 29, 1987).

> take any other response measure consistent with the national contingency plan which [EPA] deems necessary to protect the public health or welfare or the environment.

42 U.S.C. § 9604(a)(1).[2]

3. Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), provides EPA with broad access authority in order to effectuate the purposes of CERCLA. This provision states in relevant part:

> (1) <u>ACTION AUTHORIZED</u> -- Any officer, employee, or representative of the President, duly designated by the President, is authorized to take action under paragraph (2), (3), or (4) (or any combination thereof) at a vessel, facility, establishment, place, property or location or, in the case of paragraph (3) or (4), at any vessel, facility, establishment, place, property, or location which is adjacent to the vessel, facility, establishment, place, property, or

---

[2] "Hazardous substances" are broadly defined in section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and include all substances identified at 40 C.F.R. § 302.4.

A "release" is defined at section 101(22) of CERCLA, 42 U.S.C. § 9601(22), to include, with certain exceptions not relevant here, "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment."

The National Contingency Plan, 40 C.F.R. Part 300 ("NCP"), was originally developed under section 311(c)(2) of the Clean Water Act, 33 U.S.C. § 1321(c)(2), to guide federal agencies in removing oil or hazardous substances from the waters of the United States. Congress directed EPA, through section 105 of CERCLA, 42 U.S.C. § 9605, to revise and republish the NCP to "reflect and effectuate the responsibilities and powers created by (CERCLA)." The NCP now sets forth procedures and requirements for responding to hazardous waste sites.

"Removal" is defined in section 101(23) of CERCLA, 42 U.S.C. § 9601(23), to mean "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of a threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damages to the public health or welfare or to the environment, which may otherwise result from a release or threat of release."

location referred to in such paragraph (3) or (4) . . . The authority of paragraphs (3) and (4) may be exercised only if there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant. The authority of this subsection may be exercised only for the purposes of determining the need for response, or choosing or taking any response action under this title, or otherwise enforcing the provisions of this title.

. . .

(3) ENTRY -- Any officer, employee, or representative described in paragraph (1) is authorized to enter at reasonable times any of the following:

(A)  Any vessel, facility, establishment, or other place or property where any hazardous substance or pollutant or contaminant may be or has been generated, stored, treated, disposed of, or transported from.

(B)  Any vessel, facility, establishment, or other place or property from which or to which a hazardous substance or pollutant or contaminant has been or may have been released.

(C)  Any vessel, facility, establishment, or other place or property where such release is or may be threatened.

(D)  Any vessel, facility, establishment, or other place or property where entry is needed to determine the need for response or the appropriate response or to effectuate a response action under this title.

(4) INSPECTION AND SAMPLES --

(A) AUTHORITY -- Any officer, employee, or representative described in paragraph (1) is authorized to inspect and obtain samples from any vessel, facility, establishment, or other place or property referred to in paragraph (3) or from any location of any suspected hazardous substance or pollutant or contaminant. Any such officer, employee, or representative is authorized to inspect and obtain samples of any containers or labeling for suspected hazardous substances or pollutants or contaminants. Each such

inspection shall be completed with reasonable promptness.
42 U.S.C. § 9604(e).

4. The Chemical Metals Industries Site ("Site") consists of two distinct parcels which are located at 2001 and 2103 Annapolis Road in Baltimore, Maryland. Between approximately 1975 and 1981, the Site was owned by Chemical Metals Industries, Inc., a/k/a Chemicals-Metals Industries, Inc., ("CMI"), which operated a metals recovery operation at the Site. The property at 2103 Annapolis Road ("Parcel 2") was used by CMI as an office, laboratory and manufacturing center, and the property at 2001 Annapolis Road ("the Property") was used as a storage yard for the nearby CMI industrial operation.  See Declaration of Mitch A. Cron ("Cron"), at ¶¶ 6 & 7 (Attachment 1). Parcel 2 is currently owned by the Maryland Department of the Environment ("MDE"). Cron, at ¶ 18.  The Property is identified in a March 20, 1975 deed by and between M.C.S. Corporation and Chemicals-Metals Industries, Inc., which is recorded in the Land Records of Baltimore City, Liber R.H.B. 3216, Page 605. Cron, at ¶ 6. (See Attachment B to Attachment 1).

5. The Site was discovered by MDE in August 1981. During the initial inspection, the Property was found to include a storage garage and an adjoining yard enclosed with an 8-foot high block wall and chain-link gate. Within the yard and garage, approximately 1,157 deteriorating drums were observed piled haphazardly on top of each other and on deteriorating wooden pallets, which MDE believed had been partially deteriorated by the fluids leaking from the drums. The drums were determined to be full of miscellaneous scrap metal and debris, as well as liquid wastes, including solvents, acids, and caustics. Cron, at ¶ 7.

6. Between September and December 1981, EPA conducted an emergency removal action. The removal action at the Property included removal of the drums, abandonment-in-place of a waste oil underground storage tank ("UST") using concrete slurry, capping of the Property with one foot of clayey fill, and sodding it for use as a playground. Cron. at ¶ 7.

7. In 2005, MDE sampled groundwater monitoring wells located on the Property which showed elevated levels of trichloroethylene ("TCE") and tetrachloroethylene ("PCE") well above the groundwater screening levels for these contaminants of 5.3 parts per billion ("ppb") and 110 ppb, respectively, in EPA's 2002 Vapor Intrusion Guidance. Analysis of samples taken from monitoring wells on the Property detected TCE at 1,393 and 82 ppb, and PCE at 1,788 and 455 ppb. Cron. at ¶¶ 8 & 9.

8. The safe drinking water standard, or Maximum Contaminant Level ("MCL") for drinking water under the federal Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f to 300j-26, for TCE is 5 ppb, and the MCL for PCE is 5 ppb. (See 40 C.F.R. § 141.61(a).)

9. In the summer of 2007 and the winter of 2008, MDE performed vapor monitoring in the sub-slab soil, the basement, and the indoor air (first floor) in 4 properties along Annapolis Road between the Property and Parcel 2. High levels of TCE and PCE were found at 2009 Annapolis Road, the parcel adjacent to the Property, with TCE at 20,000 micrograms per cubic meter ("$\mu g/m^3$"), and PCE at 350,000 $\mu g/m^3$ in the sub-slab soil vapor. In addition, indoor air concentrations of TCE and PCE within the basement of 2009 Annapolis Road, as sampled during the same time frame, were 3.7 micrograms per cubic meter and 34 micrograms per cubic meter, respectively. In the winter of 2008, the indoor air concentrations of TCE and PCE within the

basement of 2009 Annapolis Road were 4.9 $\mu g/m^3$ and 97 $\mu g/m^3$, respectively; and the concentrations of TCE and PCE found in the first floor were 3.6 $\mu g/m^3$ and 78 $\mu g/m^3$, respectively. Cron, at ¶ 11.

10.  In September 2008, MDE performed a risk assessment and concluded that the potential cancer risk to residents of 2009 Annapolis Road was an additional 5.02 cancer cases for every 1,000 people exposed to the contaminants in the vapor, or 5.02E-3. Cron, at ¶ 12. This cancer risk is greater than the upper end of EPA's acceptable cancer risk range of one additional cancer for every 1 million exposed individuals to one additional cancer for every 10,000 exposed individuals (or "1E-6 to 1E-4") referenced in the NCP at 40 CFR § 300.430(e)(2)(i)(A)(2).

11.  Based on the cancer risk posed as a result of the vapor intrusion into the homes adjacent to the Property, EPA sought access to the Property to investigate the source of the contamination in 2009. On May 21, 2009, EPA representatives met with Magistrate Judge Susan K. Gauvey to apply for a warrant for access to the Property for the purpose of collecting soil samples to determine if contamination in the soils at the Property was contributing to vapor intrusion in adjacent homes, and/or groundwater contamination underneath the Site. Magistrate Judge Gauvey signed the warrant authorizing access to the Property for 90 days. EPA On-Scene Coordinator ("OSC") Greg Ham, together with EPA contractors, conducted the sampling at the Property on July 8, 2009. Sampling included the collection of 17 subsurface soil samples and 3 surface soil samples for analysis. Following the analysis of the soil samples, EPA concluded that contaminant levels in soil at the Property did not present a direct contact threat to human health, and did not appear to contribute to vapor intrusion or groundwater contamination. EPA also

concluded that additional soil cleanup at the Property would not reduce the vapor intrusion threat present at the adjacent residential homes, or improve groundwater quality; and EPA determined not to take any further removal actions at the Property at that time. Cron, at ¶ 13.

12. MDE installed sub-slab venting systems in the three residences at 2009, 2011 and 2013 Annapolis Road in 2011 to address the high concentrations of Site-related contaminants in sub-slab soil vapor and the potential for vapor intrusion. To date, MDE has continued to maintain those systems in order to ensure protection of human health. Cron, at ¶ 14.

13. MDE has requested that EPA provide assistance with regard to the further characterization of environmental contamination at 2001 Annapolis Road, which MDE believes may be contributing to the elevated concentrations of TCE and PCE present in sub-slab soil vapor beneath 2009 Annapolis Road and two other adjacent row houses. Cron, at 15. Although EPA concluded as a result of the sampling performed in 2009 that conducting a soil cleanup at the Property would not contribute to an improvement in groundwater quality or reduce vapor intrusion into the adjacent homes, EPA believes that use of a more sophisticated technology may facilitate the identification of a subsurface source of environmental contamination causing the elevated concentrations of TCE and PCE in the sub-slab soil vapor beneath 2009 Annapolis Road, if such a source exists. EPA has agreed to investigate further with the intention of locating the source of contamination. Cron, at ¶ 16.

14. EPA and MDE have coordinated to establish a scope of work for the environmental characterization activities to be conducted at 2001 Annapolis Road. The scope of work is detailed in the Sampling and Analysis Plan. The scope of work includes use of a real-

time subsurface contamination monitoring device called a "membrane interface probe" ("MIP"), which collects data on both soil and groundwater contamination, and the collection of additional soil and groundwater samples using a direct push technology ("DPT") rig. The environmental characterization work is comprised of the following:

    a.    26 MIP borings will be advanced on the Property to obtain real-time data with regard to volatile organic compound ("VOC") contamination in the subsurface. Based on local geological conditions, the MIP borings are expected to be advanced to approximately 30 feet below ground surface.

    b.    25 soil samples will be collected by a DPT rig. The soil samples will be analyzed for VOC contamination.

    c.    14 groundwater samples will be collected by a DPT rig. The groundwater samples will be analyzed for VOC contamination.

Together, the MIP data, soil data, and groundwater data will constitute the environmental characterization of the Property. The total projected time frame to complete all activities on the Property is approximately 3 months, although the field work will be completed within approximately 3 weeks of the date of entry on the Property. Following an initial week to identify and mark the location of the existing utilities on the Property, the time frame for MIP field work and soil and groundwater sampling will be approximately 2 weeks. Thereafter, several drums of investigation-derived waste ("IDW"), secured in locked containers, will remain on-site for 60 to 80 days, awaiting completion of waste characterization necessary to determine the appropriate disposal method/facility for the waste. Cron, at ¶ 17.

15. EPA has learned the following with regard to the status of the ownership of the Property: that several creditors initiated a proceeding against CMI in Maryland State Court for Assignment for the Benefit of Creditors in or about 1980 or 1981, and that CMI was dissolved by order of the Court on August 28, 1981. However, the Court was unable to locate any records associated with this case. In addition, EPA learned that the Court appointed a receiver for CMI to liquidate CMI's assets for the benefit of its creditors; that when the receiver learned that there were hazardous substances present on the Property and Parcel 2, the receiver recalled signing a single deed turning the property over to the State of Maryland; that a deed dated January 27, 1982 conveyed property including 2103 Annapolis Road (Parcel 2) from CMI to the State of Maryland; and that the Property (2001 Annapolis Road) had been conveyed to CMI in 1975, but never conveyed by CMI to any other party thereafter. Cron. at ¶ 18.

16. EPA has learned the following with regard to the ownership of CMI and the identity of its directors: that CMI was owned until late 1979 by Isaac Pancer; that, after his death, his wife, on behalf of the estate, sold the stock; that L&M Associates, Inc. ("L&M") became the sole stockholder of CMI in March 1980; that Warren Stein was the president of CMI as well as the president of L&M as of March 1, 1980; that Lester Feit was the vice president of L&M; that Jeanne Mandel was a stockholder of L&M; that L&M Associates, Inc., a Maryland Corporation, which owned the stock of CMI, forfeited its charter and no longer exists; that CMI's corporate charter was forfeited as of October 7, 1981; that a Lester Feit formerly residing in Baltimore, Maryland, died in 2010; that a Jeanne Mandel died in 2001; that a Warren M. Stein resides in Arnold, Maryland; and that this Mr. Stein is 57 years old. Cron. at ¶ 19.

17. Under Maryland law, Mr. Stein is a director of CMI who may have the power to act on behalf of CMI. The Maryland Code defines "director" as "a member of the governing body of a corporation, whether designated as a director, trustee, or manager or by any other title." Md. Code Ann. CORPORATIONS AND ASSOCIATIONS at § 1-101(k) (Michie 2008). A director of a Maryland corporation whose charter has been forfeited becomes a trustee of the corporate assets until a court appoints a receiver. Id. at § 3-515(a). Such a director-trustee has the power to perform "all other acts consistent with law and the charter of the corporation necessary or proper to liquidate the corporation and wind up its affairs." Id. at § 3-515(c)(4). Here, Mr. Stein acted as the president of CMI and of L&M, which owned all of the stock in CMI, and CMI and L&M both forfeited their corporate charters. Cron, at ¶ 19. As a result, Mr. Stein is a director of both CMI and L&M who may have the power to act on behalf of CMI in winding up the corporation's affairs.

18. Mr. Cron attempted unsuccessfully to contact Mr. Stein to determine if he would agree to provide EPA with access to 2001 Annapolis Road. On June 21, 2013 he attempted to contact Mr. Stein at (410) 757-0921 and (410) 212-5945. The former number was out of service; the latter number was not answered and a recording indicated that a "voice mail box" had not been set up for the number. Later in the day, he received a call back from the latter number, but the caller indicated the latter number was not used by a "Warren Stein." Cron, at ¶ 20.

19. Alternatively, the receiver appointed by the Court to liquidate the corporate assets of CMI may have the power to act on behalf of CMI. Under Maryland law, "[t]he receiver of a Maryland corporation being voluntarily or involuntarily dissolved is vested with full title to all

the assets of the corporation and has full power to enforce obligations or liabilities in its favor. He shall liquidate the assets of the corporation and wind up its affairs under the supervision of the court and has all powers necessary for that purpose." Md. Code Ann. CORPORATIONS AND ASSOCIATIONS at § 3-418(a). The EPA Civil Investigator placed several calls between August and December 2008 to the firm of Weinstock, Friedman and Friedman, PA located in Baltimore, Maryland, which was the receiver appointed by the Court for CMI. On December 19, 2008, the secretary to Melvin Weinstock left a voicemail reply stating that she had spoken with Mr. Weinstock and that he had no knowledge of the matter and did not recall being a receiver for the property or company. In addition, his secretary stated that she had researched the matter herself and could not find any information in their files. Cron, at ¶ 21. Hence, while the receiver may retain the authority to act on behalf of the dissolved corporation, the Court-appointed receiver in this case has no recollection or information regarding its involvement in this matter.

20.     Pursuant to section 104(e)(1), (3), and (4) of CERCLA, 42 U.S.C. § 9604(e)(1), (3), and (4), if there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant, EPA is authorized to enter, inspect, and take samples at a site for the purposes of determining the need for response, or choosing or taking a response, or otherwise enforcing the provisions of CERCLA. EPA has a reasonable basis to believe that there may be a release or threat of release of a hazardous substance or pollutant or contaminant from the Property, based on groundwater sampling performed by MDE at the Property in 2005, which detected TCE as high as 1,393 ppb and PCE as high as 1,788 ppb; and vapor monitoring performed by MDE at the adjacent properties in the summer of 2007 and the

winter of 2008, which detected soil vapor concentrations of TCE at 20,000 µg/m$^3$ and PCE at 350,000 µg/m$^3$, causing cancer risks in the basement in the summer, and in the basement and the first floor in the winter, at 2009 Annapolis Road in excess of EPA acceptable risk levels. (See Paragraphs 7, 9, & 10, above).

21.  A federal agency is authorized to apply for a warrant if Congress has granted the Agency statutory entry authority. Bunker Hill Co. v. United States, 658 F. 2d 1280, 1285 (9th Cir. 1981). Warrants may be obtained on an ex parte basis. Bunker Hill, at 1285. A lesser showing on probable cause is required for an administrative search than for a criminal search. The U.S. Supreme Court has noted that:

> [p]robable cause in the criminal sense is not required. For purposes of an administrative search . . . probable cause justifying the issuance of a warrant may be based not only on specific evidence of an existing violation but also on a showing that 'reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment].'

Marshall v. Barlow's, Inc., 436 U.S. 307, 320-21 (1978) (quoting Camara v. Municipal Court, 387 U.S. 523, 538 (1967)). EPA's statutory authority to enter, inspect, obtain samples, and perform removal activities is clear. See 42 U.S.C. § 9604(a) and (e). In the present case, EPA seeks a warrant to implement and enforce the provisions of CERCLA, i.e., to perform response actions (inspections and sampling) in response to a release or threat of release of hazardous substances into the environment from the Property. The standards for performing such response actions are contained within the NCP, 40 C.F.R. Part 300.

22. The United States therefore seeks an Administrative Warrant for entry, inspection,

and sampling activities at the Property as described in Paragraph 14, above.

    Respectfully Submitted:

    Rod J. Rosenstein
    United States Attorney

By: _____
    Larry D. Adams, Bar No. 03118
    Assistant United States Attorney
    36 South Charles Street, 4th Floor
    Baltimore, MD 21201
    410-209-4801

OF COUNSEL:

Elizabeth B. Lukens
Senior Assistant Regional Counsel
U.S. Environmental Protection Agency
1650 Arch Street
Philadelphia, PA 19103