## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF:            :
                           :     **Docket No.**  *Misc 13-350*

CHEMICAL METALS INDUSTRIES, INC.   :
BALTIMORE, MARYLAND            :

### DECLARATION OF MITCH A. CRON

I, Mitch A. Cron, pursuant to 28 U.S.C. § 1746 declare under penalty of perjury that the foregoing is true and correct as follows:

1.      I am currently employed by the United States Environmental Protection Agency ("EPA"), Region III, as a Remedial Project Manager ("RPM") in the Hazardous Site Cleanup Division ("HSCD") and have been so employed since July 2002.

2.      From 1994 to 2000, I was an environmental consultant for a company called Property Solutions, Inc., where I performed environmental due diligence work.  From 2000 to 2002, I was a Peace Corps volunteer in Mauritania in West Africa.

3.      I received a Bachelor of Science in Biology from Villanova University in 1994, and a Master of Science in Applied Geosciences from the University of Pennsylvania in May 2013.  I also completed a 40-hour Hazardous Waste Operations Worker training course in September 1994.

4.      RPMs are responsible for, among other things, coordinating, monitoring and directing remedial or other responses at hazardous waste sites under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601-9675, and subpart E of the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300 ("NCP").

5.      I was assigned as the RPM for the Chemical Metals Industries, Inc. ("CMI") Site ("Site") in approximately 2006, and currently serve as the RPM for this matter.

6.      The Site consists of two distinct non-adjacent parcels which are located at 2001 and 2103 Annapolis Road in Baltimore, Maryland.  This Declaration is intended to support EPA's entry to the parcel at 2001 Annapolis Road ("the Property").  A map depicting the location of the Property is included as Attachment A.  The Property is identified in a March 20, 1975 deed by and between M.C.S. Corporation, Grantor, and Chemicals-Metals Industries, Inc., Grantee, which is recorded in the Land Records of Baltimore City, Liber R.H.B. 3216, Page 605. (See Attachment B).

7.      I have reviewed documentation regarding the history of the Site, including a "Sampling and Analysis Plan, Technical Assistance, Chemical Metals Industries, Baltimore, Maryland," prepared by Hydrogeologic, Inc., a contractor for EPA, dated April 2012; and a "Request for Removal Action Restart at the Chemical Metals Industries, Inc. Site," from Stephen Jarvela, On-Scene Coordinator ("OSC") to Abraham Ferdas, Director, HSCD, dated September 29, 1998.  Review of these documents reveals the following:

a.      CMI operated a metals recovery operation at the Site between approximately 1974 and 1981.  (Note that the deed for the Property indicates that it was acquired by CMI on March 20, 1975.)

b.      The property at 2103 Annapolis Road ("Parcel 2") was used by CMI as an office, laboratory and manufacturing center, and the Property was used as a storage yard for the

nearby CMI industrial operation.

c.      From the 1950s until 1974, a gasoline station was located at the Property; the service station building/garage was located in the southeastern corner of the Property.

d.      The Site was discovered by MDE in August 1981.  During the initial inspection by MDE, the Property was found to include a storage garage and an adjoining yard enclosed with an 8-foot high block wall and chain-link gate.  Within the yard and garage, approximately 1,157 deteriorating drums were observed piled haphazardly on top of each other and on deteriorating wooden pallets, which MDE believed had been partially deteriorated by the fluids leaking from the drums.  The drums were determined to be full of miscellaneous scrap metal and debris, as well as liquid wastes, including solvents, acids, and caustics.

e.      Between September and December 1981, EPA conducted an emergency removal action.  The removal action at the Property included removal of the drums, abandonment-in-place of a waste oil underground storage tank ("UST") using concrete slurry, capping of the Property with one foot of clayey fill, and sodding it for use as a playground.

8.      I have reviewed Site files which provided me with the following information regarding sampling of groundwater on the Property:

a.      In 2005, MDE conducted sampling of groundwater monitoring wells which it had installed on the Property.

b.      Analysis of samples taken from monitoring wells on the Property detected

trichloroethylene ("TCE") at 1,393 and 82 parts per billion ("ppb"), and tetrachloroethylene ("PCE") at 1,788 and 455 ppb.

9.      These reported levels are well above the groundwater screening levels for TCE and PCE of 5.3 ppb and 110 ppb, respectively, in EPA's 2002 Vapor Intrusion Guidance.

10.     The safe drinking water standard, or Maximum Contaminant Level ("MCL") for drinking water under the federal Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f to 300j-26, for TCE is 5 ppb, and the MCL for PCE is 5 ppb. (See 40 C.F.R. § 141.61(a).)

11.     I have reviewed laboratory data regarding vapor intrusion sampling performed by MDE. Review of these documents revealed the following:

a.      MDE performed vapor monitoring in the sub-slab soil, the basement, and the indoor air (first floor) in 4 properties along Annapolis Road between the Property and Parcel 2 in the summer of 2007 and the winter of 2008.

b.       The sub-slab soil vapor concentrations of TCE and PCE beneath 2009 Annapolis Road (the row house adjacent to the Property), as sampled in August 2007, were 20,000 micrograms per cubic meter ("$\mu g/m^3$") and 350,000 $\mu g/m^3$, respectively.

c.      The indoor air concentrations of TCE and PCE within the basement of 2009 Annapolis Road, as sampled during the same time frame, were 3.7 $\mu g/m^3$ and 34 $\mu g/m^3$, respectively.

d.      The indoor air concentrations of TCE and PCE within the basement of 2009 Annapolis Road, as sampled during the winter of 2008, were 4.9 $\mu g/m^3$ and 97 $\mu g/m^3$,

respectively; and the concentrations of TCE and PCE found in the first floor were 3.6 $\mu g/m^3$ and 78 $\mu g/m^3$, respectively.

12.     I have reviewed a document provided by MDE, entitled "Review of Vapor Intrusion Exposure Pathway, Chemical Metals Industries, Annapolis Road, Baltimore, Maryland." This document was prepared by MDE, and is dated September 22, 2008. This document indicates that the MDE risk assessment concluded that the potential cancer risk posed to residents of 2009 Annapolis Road by the TCE and PCE vapor levels cited above was an additional 5.02 cancer cases for every 1,000 people exposed to the contaminants in the vapor, or 5.02E-3. This cancer risk is greater than the upper end of EPA's acceptable cancer risk range of one additional cancer for every 1 million exposed individuals to one additional cancer for every 10,000 exposed individuals (or "1E-6 to 1E-4") referenced in the NCP at 40 CFR § 300.430(e)(2)(i)(A)(2).

13.     EPA applied for, and received, a warrant authorizing entry to the Property in 2009 to perform an investigation of environmental conditions.  I have reviewed EPA CMI files regarding EPA's 2009 application for the warrant for access to the Property, as well as files describing the work performed on the Property pursuant to the warrant and EPA's findings and conclusions from such work, and learned the following:

a.     Based on the cancer risk posed as a result of the vapor intrusion into the homes adjoining the Property, on May 21, 2009, EPA representatives met with Magistrate Judge Susan K. Gauvey to apply for a warrant for access to the Property for the purpose of

collecting soil samples to determine if contamination in the soils at the Property was contributing to vapor intrusion in the adjacent homes, and/or groundwater contamination underneath the Site. Magistrate Judge Gauvey signed the warrant authorizing access to the Property for 90 days.

b.      EPA OSC Greg Ham, together with EPA contractors, conducted the sampling at the Property on July 8, 2009. Sampling included the collection of 17 subsurface soil samples and 3 surface soil samples for analysis.

c.      Following the analysis of the soil samples, EPA concluded that contaminant levels in soil at the Property did not present a direct contact threat to human health, and did not appear to contribute to vapor intrusion or groundwater contamination. EPA also concluded that additional soil cleanup at the Property would not reduce the vapor intrusion threat present at the adjacent residential homes, or improve groundwater quality; and EPA determined not to take any further removal actions at the Property at that time.

14.      According to my correspondence via email dated June 14, 2013 with representatives of MDE, in 2011 MDE installed sub-slab venting systems in the three residences at 2009, 2011, and 2013 Annapolis Road to address the high concentrations of Site-related contaminants in sub-slab soil vapor and the potential for vapor intrusion. This email correspondence further indicates that MDE has continued to maintain those systems in order to ensure protection of human health.

15.      I was present at a meeting between the EPA HSCD and the MDE Land

Management Administration on August 26, 2010 at which MDE requested that EPA provide

assistance with regard to the further characterization of environmental contamination at the

Property, which MDE believes may be contributing to the elevated concentrations of TCE and

PCE present in sub-slab soil vapor beneath 2009 Annapolis Road and the two other adjacent row

houses.

      16.     Although EPA concluded on the basis of the sampling performed at the Property

in 2009 that conducting a soil cleanup at the Property would not contribute to an improvement in

groundwater quality or reduce vapor intrusion into the adjacent homes, EPA believes that use of

a more sophisticated technology may facilitate the identification of a subsurface source of

environmental contamination causing the elevated concentrations of TCE and PCE in the sub-

slab soil vapor beneath 2009 Annapolis Road, if such a source exists.  As reflected in a letter

from Ronald J. Borsellino, EPA HSCD Director, to Horacio Tablada, Director of the MDE Land

Management Administration, dated September 24, 2010, EPA has agreed to investigate further

with the intention of locating the source of contamination.

      17.     EPA and MDE have coordinated to establish a scope of work for the

environmental characterization activities to be conducted at the Property.  The scope of work is

detailed in the Sampling and Analysis Plan.  The scope of work includes use of a real-time

subsurface contamination monitoring device called a "membrane interface probe" ("MIP"),

which collects data on both soil and groundwater contamination, and the collection of additional

soil and groundwater samples using a direct push technology ("DPT") rig.  The environmental

characterization work is comprised of the following:

  a.      26 Membrane Interface Probe (MIP) borings will be advanced on the Property to

  obtain real-time data with regard to volatile organic compound (VOC) contamination in

  the subsurface.  Based on local geological conditions, the MIP borings are expected to be

  advanced to approximately 30 feet below ground surface.

  b.      25 soil samples will be collected by a DPT rig.  The soil samples will be analyzed

  for VOC contamination.

  c.      14 groundwater samples will be collected by a DPT rig. The groundwater samples

  will be analyzed for VOC contamination.

Together, the MIP data, soil data, and groundwater data will constitute the environmental

characterization of the Property.  The total projected time frame to complete all activities on the

Property is approximately 3 months, although the field work will be completed within

approximately 3 weeks of the date of entry on the Property.  Following an initial week to identify

and mark the location of the existing utilities on the Property, the time frame for MIP field work

and soil and groundwater sampling will be approximately 2 weeks.  Thereafter, several drums of

investigation-derived waste ("IDW"), secured in locked containers, will remain on-site for 60 to

80 days, awaiting completion of waste characterization necessary to determine the appropriate

disposal method/facility for the waste.

  18.      According to my review of the Maryland Real Property Database, as of July 17,

2013, CMI is still the owner of the Property.  Furthermore, based on my review of EPA's CMI case files, I have learned the following with regard to the status of the ownership of the Property:

a.      Several parcels of land, including Parcel 2 and the Property, were conveyed to CMI in 1975 (See Attachment B).

b.      Several creditors initiated a proceeding against CMI in Maryland State Court for Assignment for the Benefit of Creditors in or about 1980 or 1981, and CMI was dissolved by order of the State Court on August 28, 1981; however, the State Court has been unable to locate any records associated with this case.

c.      The State Court appointed a receiver for CMI to liquidate CMI's assets for the benefit of its creditors.

d.      When the receiver learned that there were hazardous substances present on the Property and Parcel 2, the receiver recalled signing a single deed turning both the Property and Parcel 2 over to the State of Maryland.

e.      A deed dated January 27, 1982 conveyed property including Parcel 2 from CMI to the State of Maryland, but the Property was not included in that conveyance, nor was it conveyed to any other party thereafter.

19.     Based on my review of EPA's CMI case files, and my correspondence with EPA Civil Investigator Carlyn Prisk, I have learned the following with regard to the ownership of CMI and its former directors:

a.      CMI was owned until late 1979 by Isaac Pancer; after his death, his wife, on

behalf of the estate, sold the stock.

b.      L&M Associates, Inc. ("L&M") became the sole stockholder of CMI in March

1980.

c.      Warren Stein was the president of CMI as well as the president of L&M as of

March 1, 1980; Lester Feit was the vice president of L&M; and Jeanne Mandel was a

stockholder of L&M.

d.      L&M Associates, Inc., a Maryland Corporation, which owned the stock of CMI,

forfeited its charter and no longer exists.

e.      CMI's corporate charter was forfeited as of October 7, 1981.

f.      A Lester Feit formerly residing in Baltimore, Maryland, died in 2010; a Jeanne

Mandel died in 2001; a Warren M. Stein resides in Arnold, Maryland; and this Mr. Stein

is 57 years old.

20.     On or about June 21, 2013, I attempted to contact Mr. Stein to determine if he

would agree to provide EPA with access to the Property. EPA Civil Investigator Carlyn Prisk

provided me with two phone numbers for Mr. Stein.  I attempted to contact Mr. Stein at (410)

757-0921 and (410) 212-5945.  The former number was out of service; the latter number was not

answered and a recording indicated that a "voice mail box" had not been set up for the number.

Later in the day, I received a call back from the latter number, but the caller stated the latter

number was not used by a "Warren Stein."  Therefore, I was not able to contact Mr. Stein regarding access to the Property.

21.    Based on my review of EPA's CMI files, I have learned the following regarding the receiver appointed by the Court for CMI:

a.    EPA Civil Investigator Carlyn Prisk placed several calls between August and December 2008 to the firm of Weinstock, Friedman and Friedman, PA located in Baltimore, Maryland, which was the receiver appointed by the Court for CMI.

b.    On December 19, 2008, the secretary to Melvin Weinstock left a voicemail reply stating that she had spoken with Mr. Weinstock and that he had no knowledge of the matter and did not recall being a receiver for the property or company.  In addition, his secretary stated that she had researched the matter herself and could not find any information in their files.

22.    Entry to the Property to perform the actions described in Paragraph 17, above, is needed for a period of 90 days.

MITCH CRON

Date  8/1/13

**ATTACHMENTS**

Attachment A          Site location map

Attachment B          March 20, 1975 deed by and between M.C.S. Corporation, Grantor, and
                      Chemicals-Metals Industries, Inc., Grantee, Recorded in the Land Records
                      of Baltimore City, Liber R.H.B. 3216, Page 605.

12

**ATTACHMENTS**

Attachment A          Site location map

Attachment B          March 20, 1975 deed by and between M.C.S. Corporation, Grantor, and
                      Chemicals-Metals Industries, Inc., Grantee, Recorded in the Land Records
                      of Baltimore City, Liber R.H.B. 3216, Page 605.